BARNES v. LINGO.

(Circuit Court, E. D. Pennsylvania. February 15, 1907.)

No. 28.

**1. PATENTS—INVENTION—CLOTHES DRYING MACHINE.**

The Barnes patents, Nos. 684,776 and 684,778, for a clothes drier and a clothes drying machine, respectively—the second being for improvements on the machine of the first—cover a true combination and disclose invention; the devices used, while old, and each performing its old function, being so combined that, by their co-operative action, a greatly improved result is produced. Both also *held* infringed.

**2. SAME—CONSTRUCTION OF CLAIMS.**

The fact that the specification of a patent, in describing the invention, describes a device which is, in fact entirely useless so far as contributing to the result is concerned, does not restrict the claims to a combination including such device as an element where it is not mentioned therein.

In Equity.

Frank S. Busser and George J. Harding, for complainant.

Walter C. Pusey, for respondent.

HOLLAND, District Judge. William M. Barnes brought this suit against John Lingo for the infringement of letters patent Nos. 684,776 and 684,778, both issued to Barnes October 22, 1901, for respectively a clothes drier and clothes drying machine. All the 10 claims of the first, and claims 1 to 17 inclusive and 21 and 24 of the second patent, are involved. The second of these patents relates to certain improvements upon the first, and both patents are used in the construction of a complete clothes drier as now manufactured by Barnes. The defendant has in his possession, and is using, a clothes drying machine which is identical in construction with those manufactured by the complainant, in accordance with the claims of the patents in question. As matters of defense, the defendant avers that all said claims are in-

valid, first, because their subject matters are anticipated by structures of the prior art; secondly, they involve no invention as combinations, but are mere aggregations of old devices; and, thirdly, that defendant's drier is not an infringement of said claims.

Prior to July 1900, the method of drying clothes in drying rooms was very unsatisfactory. There were two types of drying rooms used by laundrymen. One known at the "Henrici room," provided with steam heating coils distributed upon the floor of the room. The room was provided with a number of racks or drawers having rollers running upon tracks on the top of the room, the tracks extending beyond the front of the room. The racks or drawers were moved by hand on the tracks in and out of the room, and, when in the room, the outer ends formed or closed the front thereof. The racks were pulled out of the room and clothes to be dried hung thereon, and were then pushed back and remained there until the clothes were dried, when the racks were again pulled out by hand and dried goods removed and others to be dried hung thereon. This room was in use for many years, but was defective in that the heating coils being on the floor, garments dropping from the rack were burned and soiled. The whole operation being manual, required all the time of the operator to put on and take off the goods and to determine the duration they were to remain in the drying room. The process was consequently very slow.

There was also in use what was known as the "Hurricane room," which is provided with heating coils on the sides only, and an upright section in the centre of the room, and a fan on the ceiling forcing the air downward. In this room, as in the previous room, racks were used to support the goods, which racks were either supported by wheels traveling upon overhead tracks or supported upon trucks, the wheels of which run upon tracks on the floor of the room. This room increased the heat, and thus shortened the drying operation. The whole operation, however, in placing and removing the goods and drawing the racks in and out of the room was manual. The drying was more rapid than in the Henrici room, but the evenness of drying of that room was lost, and goods in different parts of the Hurricane room dried with different degrees of speed; those nearest the coils drying the faster. An attendant was necessary at all times to watch the drying in order to prevent discolorations from overdrying, and frequently the bars of the racks near the heating coils were not used, thus lowering the capacity of the room. The process of drying clothes in these rooms was slow and unsatisfactory. Laundrymen were endeavoring to improve the method of doing this work, and at their conventions the matter of improvement in drying rooms was a subject of much discussion by them. Barnes, by a combination of old devices, succeeded in solving the problem and furnished a drying room with none of the defects of those previously used. He combined the uniformity of drying of the Henrici room without its slowness, with the rapidity of drying of the Hurricane room without its nonuniformity of drying. The capacity of the room was increased, with no danger of burnt or soiled garments or discolorations, and finally an automatic drying room was obtained, one in the operation of which no attendant was required except to place the goods upon the pins.

I find from the evidence that the drying machine in the possession and used by the defendant is a device such as is covered by the first six claims of patent No. 684,776, with the improvement described in complainant's patent No. 684,778.

A drying room, in accordance with the patent No. 684,776, as improved by patent No. 684,778, is a closed room about 6½ feet long, 3½ feet wide, and 6½ feet high, through which the clothes are slowly carried by an endless conveyor arranged on edge; that is, having the links vertically disposed, so that there is room to give the conveyor a number of turns in the room, and allow the garments to take a serpentine course in their travel through the upper part of the room. The clothes are hung by an attendant upon the conveyor at the outside of the room, near an opening into the room, and after traversing the room are automatically stripped from the conveyor by a stripping mechanism, as they pass out through an opening on the opposite side of the front of the room. The clothes are dried in the room with rapidity, because there is placed therein a number of steam-heating coils, all of which are placed along the sides of the room adjacent to the walls thereof, and below the conveyor referred to, while above the conveyor is a circular fan about two feet in diameter, belted to an outside source of power, and so arranged that, when in operation, it drives the air downwardly in the room through the garments as they take their sinuous course through the room.

The conveyor is constructed as follows: A number of straight tracks arranged parallel to each other in the room and forming a loop on the outside of the room, are suitably supported and receive rollers, carried on the upper ends of arms, which arms carry links of a continuous chain, from which depend short arms carrying a horizontal pin on each side. The support of the conveyor is made continuous by sprocket wheels, which engage the conveyor chain from one section of straight track to the next; the sprocket wheel being in a lower plane than the track, as clearly shown in the drawings. Thus the conveyor is at all times supported, and it is, because of its being on edge, disposed in a minimum of space, and that it can make so great number of turns backward and forward within the room. The conveyor is continuously driven by the sprocket wheel, which is carried by a vertical shaft extending upwardly through the room and operated through suitable power-transmitting connections, described in the patent, from any suitable source of power. Thus a continuous line of garments pass through all parts of the room several times at a constant and uniform level, and each receives the same treatment as to the degree of heat, and none are exposed too long to the direct radiation from the heating coils causing discoloration.

This improved room is claimed in varying language in patent No. 684,776 in claims from 1 to 6 inclusive. The last is as follows:

"The combination, with a drying room, provided with heating coils on the sides only of the lower portion of said room, of a conveyor traversing said room above said heating coils and at substantially the same level throughout, and an air-circulating device in said room above said conveyor and substantially central of the drying room; said circulating device driving the air in said room downward."

Claims 7 to 10 inclusive relate more particularly to the stripping device, and patent No. 684,778 is an improvement on the stripper. It is as follows:

First. Instead of the cams of the first patent, a stripping devise is used, comprising two stripping arms attached at their rear ends to horizontal brackets projecting out from the tubular guideway, and extending from said brackets forwardly and downwardly below the level of the horizontal pins upon which the goods are carried, and also converging inwardly towards the axis of the conveyor until, in the preferred form, they are secured together. By this means one of the arms serves to brace the other to form an adequately stiff and effective stripping device. This improvement is claimed in varying language in claims 1, 2, 3, 4, 9, 10, 11, 12, and 24; and following is claim 10:

"In a drier, in combination with the conveyor-chain having projecting pins thereon for carrying the goods to be dried and a track guideway on which said chain is supported, of a hanger, forwardly extending arms secured to and projecting downward from said hanger, said arms converging toward each other to a point beneath the conveyor the converging ends of said arms being secured together substantially midway of the conveyor, the arms diverging outwardly beyond the end of the pins."

Second. In order to insure the strippers being at the proper level, and to bring the strippers to the proper level for different conditions of operation, the attachment of the stripping arms at their rear ends to the horizontal brackets is vertically adjustable. This improvement is claimed in varying language in claims 13, 14, 15, and 16 in suit. Claim 16 is as follows:

"In a drier, in combination with the conveyor chain having projecting pins thereon for carrying the goods to be dried and a track guideway on which said chain is supported, of a hanger, forwardly extending arms vertically adjustably secured to and projecting downward from said hanger, said arms converging toward each other to a point beneath the conveyor, the converging ends of said arms being secured together substantially midway of the conveyor, the arms inclining upwardly to the level of the pins and diverging outwardly beyond the end of the pins."

Third. In the neighborhood of the point of stripping, the conveyor is caused to travel between lateral guides to hold the conveyor against side thrust produced by the stripping action. This improvement is claimed in claims 17 and 21. Claim 21 is as follows:

"In a drier, in combination with a conveyor, a track upon which said conveyor is supported and stripping arms extending forwardly to remove the goods from said conveyor, of a hanger secured to said track having depending arms. longitudinal guides at the end of said arms between which guides the conveyor passes in approaching and being acted upon by said stripper arms."

The defendant's drying room imbodies the combination described in patent No. 684,776, and set out in the first six claims as improved by patent No. 684,778 in the claims above set forth, all of which claims in both patents are infringed by the defendant if these patents can be sustained.

There is no doubt but that complainant was the first to construct this very complete and effective drying room. The old method of construction was very unsatisfactory, and for a long time the question of improvement was discussed by laundrymen at their annual

conventions prior to the one held at Buffalo in 1900 at which the Barnes Room was first exhibited. If it be only an aggregation of old elements requiring no invention to combine them, but only requiring mechanical skill, how did it happen that while the defects of the old room, and the urgent necessity for an improvement were for a long time felt and repeatedly discussed in conventions, no one thought of such a combination until Barnes produced it? The answer I apprehend is, that it was not so obvious as now claimed, but required, not only mechanical skill and knowledge, but that higher quality of intellectual effort, which the law recognizes as invention. Defendant insists that it is a mere aggregation, and not invention. Pickering v. McCullough, 104 U. S. 310, 26 L. Ed. 749, is cited in support of this defense. In that case the court said a combination of old elements to be regarded an invention "must form either a new machine of a distinct character and function, or produce a result due to the joint and co-operating action of all the elements, and which is not the mere adding together of separate contributions." Barnes, we think, has accomplished this in the construction of his drying room. Of course, each element in the combination acts in accordance with the law of its being, but their arrangement in relation to each other is such that by their co-operation the drying of garments is effected in a different, way from any other process of drying theretofore used, and this result is accomplished with much more rapidity, greater uniformity, with no danger of injury to the garments, and at less cost as to the attendant required. In short, the whole process has been revolutionized by this combination produced by Mr. Barnes. Of course, none of the old elements entering into it have changed their nature in the part they play in the accomplishment of the result here attained; but in combination they effect a result not theretofore produced, and this is invention. National Cash Register Co. v. American Cash Register Co., 53 Fed. 367, 3 C. C. A. 559; Heath Cycle Co. v. Hay et al. (C. C.) 67 Fed. 246; Brinkerhoff v. Aloe, 146 U. S. 515, 13 Sup. Ct. 221, 36 L. Ed. 1068.

A great number of patents have been cited against these at bar to show that everything used by Barnes in his combination had been known for a long time in this art. I shall not attempt to refer to these patents separately, but shall only state that, after an examination of the evidence by the experts on both sides in reference to these patents, I conclude that all of them are patents in an art entirely different from the art involved in the Barnes patent; and, while many of those cited patents use elements in their combination similar to those employed by Barnes, in all of them there is some difference, and in none do I find there is an entire identity.

The last defense of noninfringement is based upon the existence in the description of patent No. 684,776, line 96, of the suggestion that "any damp air escapes through an opening," at the lower back part of the drying room, about six inches wide, running the entire length of the room at the lower part, as it appeared in the model exhibited. There is nothing in either of the claims concerning this opening, but it appears that in the reasons presented to the Patent Office why the patent should be granted, the following language was used:

"The chamber is provided with a single opening in its bottom, merely to allow the heavier or saturated atmosphere to pass out, and sufficient air to come in to compensate for that. The principle is totally different from that in the cited references, which, even admitting them to disclose air circulation, certainly do not disclose air circulation as above described, which forms the basis of claims 1 to 8."

This argument was urged upon the Patent Office when the Frankenburg patent was cited as an anticipation. It is now claimed that this reference to this opening being in the specifications, and the importance attached to it at the time the application for the patent was being considered, makes it a part of this patent, and, as the defendant's device does not contain this opening, he does not infringe. It appears from the evidence that this opening in the back part of the room plays no part whatever in the process of drying. The specifications in this case unnecessarily referred to this opening, which it now appears is entirely a useless matter so far as contributing toward effecting the result attained by the patented room is concerned. The fact that they erroneously included it at the time does not now restrict them to a combination including this opening, especially as they have made no reference to it whatever in the claims of the patent. U. S. Mitis Co. v. Carnegie Steel Co. (C. C.) 89 Fed. 343; Sugar Apparatus Co. v. Yaryan Mfg. Co. (C. C.) 43 Fed. 140; Eames v. Andrews, 122 U. S. 40, 7 Sup. Ct. 1073, 30 L. Ed. 1064. The evidence shows defendant's room imbodies the combination described in patent No. 684,776, and claimed in the first six claims therein, with the device described and claimed in patent No. 684,778, in claims hereinabove set forth.

The complainant's bill is therefore sustained, and a perpetual injunction awarded.