## In re PEDDRICK et al.

### Patent Appeal No. 2652.

Court of Customs and Patent Appeals.
April 15, 1931.

Theodore K. Bryant, of Washington, D. C., for appellants.

T. A. Hostetler, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

The invention involved in this appeal from a decision of the Board of Appeals of the Patent Office, which affirmed the action of the Examiner in rejecting appellants' claims 7 and 8, relates to a process for the preparation of feldspathic flux for porcelain. Claims 7 and 8 are as follows:

"7. The process of producing feldspathic flux for porcelain consisting in separately crushing different batches of feldspathic rock containing mica, analyzing a sample of each of the separately crushed rocks, delivering the crushed rock to different points of storage in accordance with the results of such analyses, combining predetermined quantities of the crushed rock from any selected point of storage with the necessary quantity and kind of material in which said rock is deficient, pulverizing and mixing the combined crushed rock and material, and then removing the mica particles from the pulverized mixture.

"8. The process of producing feldspathic flux for porcelain consisting in crushing feldspathic rock containing mica, analyzing a sample of the rock after being crushed, combining predetermined quantities of the crushed rock with the necessary quantity and kind of material in which said rock is deficient, pulverizing and mixing the combined crushed rock and material, and then removing the mica particles from the pulverized mixture."

The references relied upon are: Pohl, 1,103,375, July 14, 1914; Eckel, Cements, Limes & Plasters (2d Ed.) 1922. (Wiley, New York), pages 292, 369, 370.

In order that we may understand the ground of rejection on the part of the board, we quote the main part of its decision:

"This application relates to the prepara-

tion of stock from feldspathic rock for use in the porcelain industry. The rock is crushed and analyzed after which the material is stored in separate bins, each bin containing material having substantially the same characteristics as indicated by the analysis; also undesirable mica particles are removed from the crushed material.

"In this industry it is necessary to furnish feldspathic rock having certain characteristics for certain purposes and in the past it has been the custom, as stated by appellant, to take samples of the rock and then subject it to the usual treatment followed in manufacturing the articles in order to ascertain what the final product will be. Rock material coming from substantially the same source was then presumed to have about the same characteristics. It would appear that there is a great deal of variation in the rock, even when coming from the same mine. By appellants' method it is possible to furnish manufacturers with exactly the kind of material which they desire as the stock may be taken from different bins and mixed to produce a blend which will have the desired characteristics.

"The examiner is unable to show that this has ever been done and appellant urges that it is a great commercial success and much superior to the old methods. We do not doubt appellants' statement in regard to this but in our opinion the industry has been lax in not employing ordinary scientific and engineering skill in handling this material. Certainly it is old in many other arts to blend stock together having different characteristics in order to produce the desired product. As one instance of this the examiner calls attention to the Eckel publication which describes this manner of handling and preparing cements. It is thought that an engineer trained in the preparation of cement should recognize the analogy in preparing stock of the nature under discussion. In both instances rock is ground up and both relate to the ceramic industry and are therefore quite analogous. Also, as shown in the patent to Pohl, it is old in the magnesite industry to produce mixtures based upon analysis of stored stocks. This is another instance of a practice that is doubtless common in various branches of the art of this general nature. None of the specific details of the claims are regarded as involving patentable distinction."

Appellants here argue that the board erred in the rejection of the claims, for the reason that the method disclosed is new as applied to the preparation of any mineral substance or material, and especially is it new in the art of preparing feldspar, and that, since the

steps of appellants' method have never been followed, in the order enumerated, in the process of preparing any kind of material in any prior art, and since these steps when so applied have produced a new and highly beneficial result, it necessarily required invention and discovery to produce the method.

Feldspar or "spar," as it is commonly called by feldspar miners, is a crystal rock forming part of certain igneous rock structures found in the United States chiefly east of the Alleghany Mountains, and the feldspar of commerce is obtained from pegmatite dikes which contain feldspar and quartz, mica and certain other mineral substances. The uses of feldspar are, according to a report of the United States Department of Commerce, Bureau of Mines, entitled "Feldspar in 1928, Mineral Resources of the United States, 1928—Part II, pages 67–80," at page 70, as follows:

"Uses

"The chief use of feldspar is as a constituent of both body and glaze in pottery, porcelain, white ware, vitrified sanitary ware, and enameled brick. Feldspar constitutes 10 to 35 per cent of the body of vitrified wares, in which it acts as a flux to bind the particles together. Glazes contain 30 to 50 per cent of feldspar. Enamels applied to metals are fused with feldspar. Bath tubs and wash bowls are commonly made of cast iron to which while hot an enamel containing much feldspar is applied.

"Glass making is another branch of the ceramic industry in which feldspar is used.
* * *

"Feldspar is also used as an abrasive in scouring soaps."

The above published report indicates that feldspar has many other uses, and that its fitness for all of its uses is for the most part dependent upon its analysis, that is to say, it must contain certain ingredients in different percentages for one use and ingredients of different and varying percentages for other uses, that it has always been very difficult to secure commercial feldspar of the chemical composition desired, and that the manufacturer using this ingredient has had to make his own analysis and mixtures, which ofttimes resulted in great loss of time and material.

From the same authority we quote the following:

"* * * Potters usually demand a uniform product, the composition of which is constant from day to day. In view of the variations mentioned above this requirement

is somewhat difficult to fulfill, and the best thought of the industry is being directed toward means of overcoming these difficulties.

\* \* \* \* \* \*

"Progressive feldspar producers and grinders are attempting to overcome the inherent lack of uniformity in their raw materials by employing technical control."

It seems to be conceded in this case that the process proposed by appellant solved the problem of technical chemical control, so that now under this process, which is being used extensively in the production of commercial feldspar, a user of feldspar may order a carload with the assurance that, when it arrives, it will be uniformly mixed, each portion of it having an analysis exactly in accordance with the order, and that such a mixture, on account of its definitely determined analysis, is found to be suitable for his manufacturing requirements without further mixing the same or making additions thereto.

It will be observed that claim 7 calls for six steps:

"1. Separately crushing different batches of feldspathic rock containing mica.

"2. Analyzing a sample of each of the separately crushed rocks.

"3. Delivering the crushed rock to different points of storage in accordance with the results of such analyses.

"4. Combining predetermined quantities of the crushed rock from any selected point of storage with the necessary quantity and kind of material in which said rock is deficient.

"5. Pulverizing and mixing the combined crushed rock and material.

"6. Removing the mica particles."

Claim 8 does not include the third step, and, when the case was presented to this court in argument, the impression was given by both sides that the only difference between claim 8 and claim 7 was that in claim 8 step 3 of claim 7 was omitted, and it was argued by appellants that the omission of this step, if the other steps of claim 7 were followed, would not render claim 8 unpatentable. An examination of claim 8 discloses that it does not contain the first two steps of claim 7 which provides for separate crushing, and for analyzation of the separately crushed rock. It does provide for "combining predetermined quantities of the crushed rock with the necessary quantity and kind of material [etc.]." We believe claim 8 reads on the prior art, and for that reason is objectionable.

From the contention of appellants, we conclude that the really important part of the process is separately crushing and analyzing each of the grades of rock, which grades are determined as the rock comes from the mine. Since different rock coming from different parts of the mine has a different analysis, it is important to separately analyze and determine the contents of each class of rock, and then, knowing the analysis of each class, a carload of feldspar of a certain analysis, desired by a manufacturer, may be obtained by mixing a sufficient quantity from different separately analyzed batches of material, to make a mixture of the desired percentage. The process is chiefly based upon the proposition that, knowing the percentage of feldspar in each separate batch, a batch of any predetermined analysis may be obtained by means of calculation.

The method most generally employed prior to the method proposed by appellants is set out in appellants' brief. The correctness of the statement is abundantly supported by various authorities cited, and is not disputed in the trial of this cause, and follows:

"Heretofore it has been customary to take the material as it comes from the mine in large lumps and hand pick it to remove all visible mica, garnet and other substances undesirable in porcelain, glass or other ceramic products. Also, the outward appearance of different feldspars differs and a rough sorting out of the undesirable forms of feldspar has also been done by hand. There then remains a mass of feldspar of unknown composition which is assumed, from typical analyses of the kind above mentioned and from the judgment and experience of the mill foreman to require certain amounts of quartz or feldspar or both to bring it to the grade desired. These amounts are added and the mixture is ground. Test cones are then made and fired just as the articles of porcelain are fired in a suitable kiln. From the behavior of these test cones the grade of the mixture is determined and, if not satisfactory an additional quantity of an ingredient or of ingredients may be added as the experience of the operator has found probably desirable. Sometimes attempts are made to check the grade before grinding by picking lumps at random from the feldspar, after it has been picked over to remove mica and the other impurities, and getting an average chemical analysis of these lumps."

The Board concedes the commercial success of appellants' method, which success is represented to be almost revolutionary, and, further, concedes that the Examiner was unable to show that this process had ever been

followed before. The Board concluded that it was old in many other arts to blend rocks having different chemical qualities in order to obtain a mixture of a certain analysis and that the particular steps proposed by appellants, even though new in the order of their application, required nothing more than scientific and engineering skill.

The reference Pohl relates to a process of making sintered magnesite and dolomite in which the raw materials are ground to make a powder or mud. The powder or mud is then mixed in silos or settling tanks and left to settle or separate according to its degree of purity and is then divided into different batches of different degrees of purity. Analyses are made of the various powders or muds and from these analyzed batches a combination is made. Then the same is burned and the desired article produced. In Pohl there are but five steps, the first of which is grinding. There is no step of removal of the mica particles. It is urged here that grinding is not practicable as the first step in preparing feldspar and that the process of Pohl could not be satisfactorily applied to the feldspar art in view of the necessity for the removal of the mica particles which, ordinarily, is done magnetically and could not be successfully done after the wetting process had been applied.

In Eckel's book the method of control for maintaining a determined standard of composition in more than one raw material is to analyze both raw materials, mix the two according to analyses, grind the same, and then, if the same is not of the proper composition, add the necessary ingredients. It is at once apparent that this is not the detailed method of appellants nor its equivalent, since the raw material in appellants' method, all coming from one mine, is separated into several different batches before it is analyzed, thus affording, ofttimes, a great number of batches of different chemical analyses which renders mixing to a predetermined analysis a matter of easy computation.

But, it is thought by the Board that the differences in the steps of the processes of the references and those of appellants do not amount to invention. The fact that the feldspar art is an old one and that the method of claim 7, which is so successful, had never been practiced before would at least seem to point in the other direction.

The Solicitor for the Patent Office, citing McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800, argues that commercial success, while evidence of utility, is not conclusive as to patentable novelty. While this is a correct statement of the law, in case of doubt commercial success is not only evidence of utility, In re Husted, 39 F.(2d) 713, 17 C. C. P. A. 1002, but is persuasive of invention, In re Schierholtz, 45 F.(2d) 283, 18 C. C. P. A. ——. In the case at bar we are impressed with the fact that appellants, by their method in claim 7, have contributed to and greatly advanced the art of feldspar production, and, while the case is not so clear as to remove all reasonable doubts as to the patentable novelty of the same, we feel constrained to resolve such doubts in favor of the applicants. That this is the correct application of a well-settled rule needs no extended citation of authorities.

It should not be overlooked that claim 7 here calls for a patent for steps in a process and that the authorities have gone far in extending protection to an inventive process even though each of the steps were old, if the steps were so related to each other as to bring about a new and useful result. German-American Filter Co. v. Erdrich (C. C.) 98 F. 300. The fact that the process may seem very simple is immaterial. United States Mitis Co. v. Midvale Steel Co. (C. C.) 135 F. 103.

By the foregoing we do not wish to be understood to hold that all methods, the individual steps of which are old, but which, by new arrangement, bring about new and useful results, are patentable. The result might be obvious, and therefore not the result of invention. We do not regard the method of claim 7 at bar as falling with this class.

The decision of the Board of Appeals is reversed as to claim 7 and affirmed as to claim 8: