## SCIENTIFIC TABLET CO. v. OSSEGE.
### No. 1600.

District Court, N. D. Ohio, W. D.
Feb. 26, 1940.

Owen & Owen, of Toledo, Ohio, and Lawrence C. Kingsland, of St. Louis, Mo., for plaintiff.

Claud L. Recker, of Ottawa, Ohio, and Clarence E. Mehlhope, of Chicago, Ill., for defendant.

KLOEB, District Judge.

Plaintiff claims infringement of United States Patent No. 1,887,073, involving a method of flavoring in canning, preserving and bottling operations and asks an injunction, accounting of profits and damages and costs.

Defendant denies the validity of the patent and denies that plaintiff was the original, first or sole inventor of a method of flavoring in canning.

Plaintiff claims that its assignor, Suppiger, has devised a new process for use in the commercial canning industry and for use particularly in the commercial canning of tomatoes, whereby the method of salting the tomatoes is improved. It claims that about the year 1914 certain commercial canners of tomatoes began the practice of adding salt to each can for the purpose of flavoring and making the product more palatable; that theretofore commercial canners had not engaged in the practice of salting their product but had allowed this duty to be performed at a time and to suit the taste of each individual housewife; that following 1914 and up to about the year 1926 many canners salted their product through the use of bulk salt applied by a worker with a spoon to each can as it passed along the conveyor, and after the can

had been filled with tomatoes; that some canners followed a method of salting by the use of brine, but that in either event, after the salt had been applied to the product in the can and the can had passed along the conveyor to the plunger for the levelling off process, that some of the product was spilled from the top of the can which contained the greatest salt content, and as a result there was no uniformity of salting and, incidentally, the adjacent machinery would become corroded through contact with the salt brine.

The witness Sells testifies that he first came in contact with salting in the commercial canning of tomatoes in the year 1914 (rec. p. 56). The witness Scott testifies that he first came in contact with salting in 1914 or 1915 (rec. p. 78), and that in scattered instances he came in contact with salting in the canning industry until 1923 or 1924. The witness Rathforn testifies that he began salting in 1923 or 1924 (rec. p. 19). Plaintiff contends that its assignor devised a new method of salting through the use of a salt tablet of predetermined weight and quantity in the year 1926; that thereafter and until the present time there has been substantial commercial success in the marketing of salt tablets for commercial canning. The record substantiates this latter contention.

It appears that Suppiger, in the year 1927, filed his application, Serial Number 205,892, in the United States Patent Office for a patent on an apparatus for dispensing flavoring materials and particularly designed at avoiding hand-dropping of salt pellets in the commercial canning industry (Plaintiff's Exhibit No. 6); that in the year 1926 he filed his application No. 145,706 for a patent claiming improvement in flavoring tablets, which application was finally rejected by the United States Patent Office (Plaintiff's Exhibit No. 5); that in 1931 he filed his application No. 506,079, on which the patent in suit, No. 1,887,073, issued, and in the application, which was for "improvement in methods of flavoring in canning, preserving and bottling operations," he stated that it was "a continuation in part of my prior application Serial No. 145,706, filed November 1, 1926, for flavoring tablets, and a continuation in part of my application Serial No. 205,892 filed July 15, 1927, for apparatuses for a method of dispensing flavoring materials" (see page 21 of file wrapper, Plaintiff's Exhibit No. 7). It ap-

pears that in the prosecution of application No. 145,706 through the Patent Office, that the application was finally rejected by the primary examiner and also by the Board of Appeals of the Patent Office; that the applicant then appealed to the Court of Customs and Patent Appeals which court affirmed the Patent Office in its final rejection of said application, Pat. App., 44 F.2d 426 (1930). The application was then abandoned and later application No. 506,079 covering the patent in suit was filed. After frequent redrafting of the claims under this application, the patent was issued covering a substituted claim (p. 25) and claims 28 and 29 (p. 26) which then became the claims numbered 1, 2 and 3 as found in the patent. The patent was issued after considerable difficulty was encountered, after the claims were amended to their present form, and, it appears, after an oral interview.

As beneficial results of this new process claimed under this patent, plaintiff contends that it produces uniform flavoring and effects a clean, accurate, economical and convenient method of salting commercially canned products and especially tomatoes.

The question here is whether plaintiff's assignor has devised a new process that rises to the dignity of a useful art.

"An art in the sense of the patent law is synonymous with a process or a method when used to produce a useful result. An art may be either a force applied, a mode of application, or the specific treatment of a specific object, *and the art must produce physical effects.*" Walker on Patents, Deller's Edition, vol. 1, p. 38, italics added, citing Kirchberger v. American Acetylene Co., C.C.N.D.N.Y. 1903, 124 F. 764.

"A patentable process is a method of treatment of certain materials to produce a particular result or product." Holland Furniture Co. v. Perkins Glue Co., 1928, 277 U.S. 245, 255, 48 S.Ct. 474, 475, 72 L.Ed. 868, 872. Cited in Walker on Patents, supra, p. 38.

"If the process, when distinguished from the means of performing it, is new, useful, and intellectually rises to the dignity of invention, it is patentable—if it falls within the meaning of the word 'art' as used in the statute." Buffalo Forge Co. v. City of Buffalo, 2 Cir., 1918, 255 F. 83, 86, 87. Cited in Walker on Patents, supra, p. 50. The plaintiff relies here, as Suppiger relied considerably in the presentation of his case before the United States Patent Office, on the case of United States Mitis Co. v. Midvale Steel Co., C.C.E.D. Pa.1904, 135 F. 103.

That case involved the Wittenstrom patent, No. 333,373, for a process for making wrought iron and steel castings consisting of the addition of a small quantity of aluminum to the iron or steel after it had been fully melted and just as it was about to be poured into the mold, the effect being to render the casting more solid and free from cavities and without injury to its quality, the result permitting the production of castings of wrought iron or mild steel, "of which there were none at the time Wittenström brought forward his invention." 135 F. at page 105.

At page 106 of 135 F., I find this statement by the Court: "In thus making possible that which was not so before, there can be little question that the inventor rendered a material service to, and made an important advance upon, the existing art."

And at page 107 of 135 F.: "But the fact is that, whatever had been the case with steel, wrought-iron castings had not been made up to the time of the invention. And if Mr. Ostberg, at whose works in Sweden the experiments were made which brought about the discovery of the process, is to be believed, the metallurgical world was astonished at the result * * *. It will hardly do in the face of this to say that nothing was contributed by the inventor to the art in which it stands."

It appears to me that the Wittenstrom process did "produce physical effects"; involved "a particular and unexpected result or product," that was far-reaching in its effect upon the steel industry, and it involved a result or product that was far from being obvious at the time that Wittenstrom conceived his process. It was "new, useful, and intellectually rose to the dignity of invention." Plaintiff contends (p. 19, brief for plaintiff): "It required the mind of the patentee Suppiger to conceive that a process of flavoring or salting involving the use of salt tablets was that long sought solution of the canning problem of salting."

It appears to me that the process of salting through the use of tablets is rather the logical development of commercial canning through the use of machinery and conveyors, and the competitive desire to improve the quality of the product led inevitably to the use of the tablet form of salting.

There was no canning salting problem. as such. The salting of tomatoes commercially canned developed through a desire to improve the product and please the trade. No new method of salting need be or was devised. Bulk salt was known and in use prior to 1926. Tablet salt was common in the salt industry prior to 1926. See Malcolm, No. 29053, A.D.1913, British. The Malcolm idea consisted of "by forming the salt into blocks or bodies as above specified, the culinary operations are greatly facilitated and the necessity for measuring to secure the desired quantity of salt is avoided." (Lines 40, 41, 42) The claim of said patent is as follows: "Salt for culinary purposes in the form of cubes, blocks or other bodies, each of said blocks or the like containing a predetermined quantity of salt, equal to a predetermined number of capsules, spoonfuls or other similar measures of capacity employed in culinary recipes." (P. 2, par. 2, of Patent No. 29053) Either bulk salt or tablet salt were or could be made available. Suppiger preferred the tablet method and made it available. Part of the trade is using it today. It does not follow that Suppiger has devised a new process that rises to the dignity of a useful art. "A new process is usually the result of a discovery." Corning v. Burden, 1853, 15 How. 252, 56 U. S. 252, 267, 14 L.Ed. 683, cited at page 49, Walker on Patents, supra. It appears to me that there has been no new discovery here. Bulk salt was old. Tablet salt was old. The salting of canned products, whether made in the home by the housewife in her kitchen or in commercial canning factories that had sprung up through the force of demand at the turn of the century, had long been employed. The desire of the commercial producer through the press of competition to make his product more palatable and enticing to the trade was inherent. It led to a salting that prior to 1914 had been left by the commercial producer to the housewife after she opened the can. When he did begin to salt, the tendency of course upon the part of the commercial producer would be to under-salt rather than over-salt, because the housewife could add to but not take therefrom. As one commercial producer began to flavor his product through the addition of salt, competition compelled others to do likewise. There began the natural and logical development in the flavoring of commercially canned products. If experience taught that the use of bulk salt caused a waste or an uneven flavor or, incidentally, a corrosion of machinery through spilling, then the logical thing was a different mode of application. Salt tablets existed. The natural and logical step was the employment of salt tablets. The result to be obtained through their use was obvious and expected. No new "physical effects," "particular results or products" ensued from the process. No "discovery" was involved.

McCall (United States Patent No. 37137), Mussgiller (United States Patent No. 9129, re-issued), Landerer (No. 3334, German), all employed the use of pellets or tablets for the improvement of the products for which they were designed and in the case of Mussgiller I find substantially the same objects accomplished as are claimed in the patent in suit, to wit, "the barrel can be easily closed by a bung without losing a particle of carbonic acid or of beer, and the said lumps can be introduced into the barrel without any waste. Besides this, the weight or size of our lumps is so gauged that each barrel will receive the exact quantity of bicarbonate of alkali and of acid required, and that the liquid in a number of barrels, after having been treated with the bicarbonate of alkali, with or without acid, will be of uniform quality." (Lines 71 to 81)

The production of a new process by the rearrangement or manipulation of known elements through application of the ordinary skill of the art does not constitute invention, although it may have required study, effort and experimentation. Barber-Coleman Co. v. Redmond Co., 6 Cir., 1938, 94 F.2d 717.

Conceding in this case plaintiff's assignor did engage in some experimentation and some study before commercially marketing his salt tablets of various sizes, yet this in itself would not constitute invention because I am of the opinion that the process which he designed was merely the manipulation of known elements brought about through application of the ordinary skill of the art and that it constituted merely a logical development of the art.

The foregoing moves me to find that the patent in suit is invalid, notwithstanding some degree of commercial success. It is my belief that Suppiger has not designed a new process that rises to the dignity of a useful art.

The bill will be dismissed at plaintiff's cost. The defendant may prepare and

submit findings of fact and conclusions of law in accordance with this opinion within fifteen days. The plaintiff may have ten days thereafter to present his objections and additions.